REPUBLIC PETROLEUM
CORPORATION,
Plaintiff,

v.

UNITED STATES of America,
Defendant.

Lucy Cocchiara, Wife of/and Louis J.
ROUSSEL, Plaintiff-Appellant,
Cross-Appellee,

v.

UNITED STATES of America, Defendant-Appellee, Cross-Appellant.

No. 77–2060.

United States Court of Appeals,
Fifth Circuit.

March 12, 1980.

Peter J. Butler, Gayle A. Reynolds, New Orleans, La., for Republic Petroleum & Lucy Cocchiara.

M. Carr Ferguson, Asst. Atty. Gen., Gilbert E. Andrews, Acting Chief, App. Section, Crombie J. D. Garrett, David English Carmack, Attys., Tax Div., Dept. of Just., Washington, D. C., for defendant.

Before THORNBERRY, GEE, and HATCHETT, Circuit Judges.

GEE, Circuit Judge:

This appeal concerns the tax consequences of the sale of two mineral leases by Louis Roussel and his wife, Lucy Cocchiara (collectively referred to as "taxpayer"), to Republic Petroleum Corporation ("Republic"). The stakes are high—the district court determined, and the government does not dispute, that the taxpayer overpaid its taxes for the tax years 1959 to 1966 in the amount of $511,878.03; yet the court concluded that taxpayer was entitled to a refund of only $242,753.15. At issue on appeal are: (1) whether Republic assumed a mortgage burdening the mineral leases for the purposes of the installment sale provision of the Internal Revenue Code; (2) whether taxpayer was properly permitted to recover a refund of taxes attributable to the disallowance of deductions and losses for 1960 and 1962; and (3) whether taxpayer was entitled to a refund of taxes paid with the filing of his tax returns for 1959–65. A brief recitation of the facts prefaces our analysis of these issues.

On July 24, 1959, taxpayer sold two mineral leases to Republic, of which Mr. Roussel was the majority shareholder and the ultimate decision maker, for a consideration of $2 million. The "Act of Sale and Assumption of Mortgage"[1] executed on that date provided that Republic would pay taxpayer $50,000 in cash and assume taxpayer's indebtedness of $1,950,000 under a mortgage note in the amount of $2,500,000 due on demand at the Whitney National Bank ("Whitney Bank"). Four days later taxpayer and Republic signed a letter agreement[2] stating that in lieu of the formal assumption of the mortgage Republic

---

1. This sale is made and accepted for and in consideration of the sum of TWO MILLION and NO/100 DOLLARS ($2,000,000.00), in part payment and reduction whereof, the present purchaser has paid the sum of FIFTY THOUSAND and NO/100 DOLLARS ($50,000.00) in cash, receipt of which amount the said vendor hereby acknowledges and grants full balance of said purchase price, to-wit: the sum of ONE MILLION NINE HUNDRED FIFTY THOUSAND and NO/100 DOLLARS ($1,950,000.00), the present purchaser assumes, binds and obligates itself for the payment of the indebtedness of vendor under that certain mortgage note in the amount of Two Million, Five Hundred Thousand and No/100 Dollars ($2,500,000.00), dated July 9, 1957, payable to the order of Bearer and due on demand at the Whitney National Bank of New Orleans, bearing interest at the rate of five and one-half percent (5½%) per annum from date, which note is paraphed "Ne Varietur" by Kalford K. Miazza, Notary Public for Orleans Parish, to identify it with an act of Mortgage and assignment passed before the said Notary Public on July 9, 1957, . .; the present indebtedness hereby assumed being the sum of One Million, Nine Hundred and Fifty Thousand and no/100 Dollars ($1,950,000.00).

The said purchaser, Republic Petroleum Corporation, does hereby bind itself to the full and final payment and discharge of said mortgage note and of the liabilities and obligations expressed and stipulated in the said act of mortgage and assignment hereinabove mentioned; and the said purchaser does take cognizance of all of the terms, provisions and conditions in the said act of mortgage and assignment, and is being purchased subject to all of said terms, provisions and conditions contained in the said act of mortgage and assignment.

2. Dear Mr. Roussel:
This will evidence our agreement that you will accept a note from this corporation in the full sum of $1,950,000 to cover the balance of the purchase price of Valentine Field leasehold

would give taxpayer a $1,950,000 promissory note, payable in monthly installments of not less than $25,000, plus interest. Republic's promissory note was secured by Roussel's own promissory note to the Whitney Bank, which was in turn secured by the mortgage on the leases.

Taxpayer's basis in the leases was $29,425.50. He realized a capital gain on the sale of $1,970,574.50. On taxpayer's tax return for 1959 he elected to report his gain on the installment basis pursuant to IRC § 453, 26 U.S.C. § 453,[3] and continued to do so in each succeeding tax year through 1965. Taxpayer timely filed each of his returns and paid the amount of tax indicated thereon.[4]

Taxpayer and the IRS filed agreements (Forms 872) to extend the statute of limitations on assessment with respect to tax years 1959 to 1966 until June 30, 1972. On February 28, 1972, the IRS assessed deficiencies for 1959, 1961 and 1963–66[5] and issued "Quick Assessment" notices for those years. The deficiency for 1959 was occasioned by the IRS' determination that taxpayer was not entitled to use the installment method and should have reported his entire gain from the sale of the mineral leases in 1959. Other adjustments in income, not relevant here, accounted for the deficiencies in each of the other years. On March 6, 1972, the IRS determined that the taxpayer had overpaid his taxes for 1960 and 1962.[6] These overpayments were cred-

---

interests, in lieu of a formal assumption by this company of the obligation now owing by you to Whitney National Bank of New Orleans, as provided in the act of sale and assumption of mortgage executed before Edward J. Boyle, Notary Public, on July 24, 1959, but that except for the deviation herein agreed upon the said act of sale and assumption of mortgage shall remain in force and effect.

We deliver to you herewith our promissory note date July 24, 1959, in the principal amount of $1,950,000.00, payable in monthly installments of not less than $25,000, interest payable monthly at the rate of 5½% from date through December 31, 1959, and at the rate of 6% thereafter; it being understood and agreed that we may anticipate the payment of principal at any time and from time to time as we may elect, without penalty, by additional payments on the said principal.

Please sign in the space provided below as your confirmation of the foregoing agreement and as your receipt for the above described note.

Very truly yours,
REPUBLIC PETROLEUM CORPORATION

3. Section 453 provides in pertinent part:
(a) Dealers in personal property.—
(1) In general.—Under regulations prescribed by the Secretary, a person who regularly sells or otherwise disposes of personal property on the installment plan may return as income therefrom in any taxable year that proportion of the installment payments actually received in that year which the gross profit, realized or to be realized when payment is completed, bears to the total contract price.

\* \* \* \* \* \*

(b) Sales of realty and casual sales of personalty.—
(1) General rule.—Income from—
(A) a sale or other disposition of real property, . . .
may (under regulations prescribed by the Secretary) be returned on the basis and in the manner prescribed in subsection (a).
(2) Limitation.—Paragraph (1) shall apply only if in the taxable year of the sale or other disposition—
(A) there are no payments, or
(B) the payments (exclusive of evidences of indebtedness of the purchaser) do not exceed 30 percent of the selling price.

4. 

| Tax Year | Amount of Tax Paid with Filing |
|---|---|
| 1959 | $101,266.51 |
| 1960 | 18,828.78 |
| 1961 | 37,061.69 |
| 1962 | 173,047.71 |
| 1963 | 114,445.68 |
| 1964 | 83,016.12 |
| 1965 | 94,209.21 |
| 1966 | -- |

5. 

| Tax Year | Amount of Deficiency | Interest | Total Assessment |
|---|---|---|---|
| 1959 | $482,722.82 | $330,703.33 | $813,426.15 |
| 1961 | 31,756.98 | 18,718.78 | 50,475.76 |
| 1963 | 97,654.24 | 45,842.64 | 143,496.88 |
| 1964 | 27,522.35 | 11,268.70 | 38,791.05 |
| 1965 | 63,566.79 | 22,212.67 | 85,779.46 |
| 1966 | 7,432.83 | 2,151.35 | 9,584.18 |

6. 

| Tax Year | Amount of Overassessment |
|---|---|
| 1960 | $ 7,803.09 |
| 1962 | 12,573.81 |

ited against taxpayer's deficiencies. Taxpayer paid the net deficiency assessments in full on March 13, 1972.

On August 15, 1973, taxpayer filed a claim for a refund for each of the years in issue. Those claims were denied, and taxpayer brought suit.[7] The district court granted the government's motion for partial summary judgment to the extent that it barred taxpayer from claiming a refund for taxes paid with the filing of his returns but permitted taxpayer to claim a refund of taxes attributable to the disallowance of certain deductions and losses for 1960 and 1962. *Republic Petroleum Corp. v. United States*, 397 F.Supp. 900, 906–07 (E.D.La. 1975). The court further determined that taxpayer was not entitled to use the installment method to report his gain on the sale of the leases. *Id.* at 907–11. The court then proceeded to examine other adjustments that the IRS had made for the tax years 1959–66. In a separate judgment the court concluded that although the government had collected $511,878.03 more from the taxpayer than it was entitled to, taxpayer was entitled to judgment for only $242,753.15.[8] Taxpayer appeals, and the government cross appeals, from these determinations. We affirm the district court's judgment, except to the extent that it permits taxpayer to recover a refund for tax years 1960 and 1962.

## I. Assumption of Taxpayer's Mortgage.

 Section 453 of the IRC[9] permits a taxpayer to report his gain from the sale of real property on the installment method so long as the payments received by the taxpayer in the year of sale do not exceed 30 percent of the selling price. Where a mortgage is "assumed by" a purchaser, however, the amount of the mortgage, to the extent that it exceeds the vendor's basis, is included as a payment received during the year of sale in determining whether payments in that year exceeded 30 percent of the price. Treas. Reg. 1.453–4(c) (1979). Thus, if Republic assumed the mortgage to which the mineral leases were subject, taxpayer would not be entitled to use the installment method.[10] Conversely, if Republic did not assume the mortgage, as taxpayer contends, taxpayer would be entitled to report his gain on an installment plan.

 The district court found that Republic had in fact assumed the mortgage.[11] Aware that the installment sale provisions are "relief provisions" to be "strictly construed," 2 Mertens, *Law of Federal Income Taxation* § 15.01 at 3, we conclude that the district court's finding was correct.

---

7. Republic also filed an action in the same court seeking the refund of federal income taxes that it alleged were erroneously assessed and collected from it by the IRS for the years 1959–66. Because of the similarity of the issues involved, Republic's action was consolidated with taxpayer's, and they were tried together. Republic appealed from the district court judgment, and the government cross appealed. Subsequently, however, a motion to dismiss the appeal and the cross appeal was granted. Consequently, Republic's refund claim is not before us.

8.

| Tax Year | Amount of the Tax Overpayment Determined by the District Court | Amount of Tax Refund Determined to be Due by the District Court |
|---|---|---|
| 1959 | $ 602.08 | $ 602.08 |
| 1960 | 1,644.07 | 1,644.07 |
| 1961 | 71,233.29 | 31,756.98 |
| 1962 | 67,750.98 | 12,573.81 |
| 1963 | 192,723.05 | 97,654.24 |
| 1964 | 97,833.81 | 27,522.35 |

| Tax Year | Amount of the Tax Overpayment Determined by the District Court | Amount of Tax Refund Determined to be Due by the District Court |
|---|---|---|
| 1965 | 72,657.92 | 63,566.79 |
| 1966 | 7,432.83 | 7,432.83 |
| | $511,878.03 | $242,753.15 (plus statutory interest) |

9. *See* n.3, *supra.*

10. The amount of the mortgage allegedly assumed ($1,950,000) exceeded taxpayer's basis ($29,425.50) by $1,920,574.50. For the purposes of section 453 and Treas. Reg. 1.453–4(c), taxpayer would have received $1,970,574.50 ($1,920,574.50 + $50,000 cash) in 1959, far in excess of 30% of the $2,000,000 sale price.

11. Because the question of whether Republic assumed the mortgage is a mixed question of law and fact, we do not use the "clearly erroneous" standard of review urged upon us by the government.

The most persuasive evidence supporting the district court's finding is the explicit language of the "Act of Sale and Assumption of Mortgage" in which Republic expressly assumed the mortgage and bound itself to the discharge of the mortgage note. *See* n.1 *supra*. That document clearly and unequivocally states that "the present purchaser assumes, binds and obligates itself for the payment of the indebtedness of vendor" under vendor's mortgage note payable to Whitney Bank. Moreover, the minutes of a special meeting of Republic's board of directors held on July 24, 1959, the same day on which the "Act of Sale" was executed, indicate that assumption of the mortgage was a prerequisite of the sale.[12]

Although Republic did subsequently execute a promissory note, there is ample evidence that Republic undertook to satisfy taxpayer's obligations to the bank. For example, one of Republic's checks, payable to taxpayer, was described on Republic's books as a payment "to reimburse interest charges paid by [taxpayer] to Whitney National Bank." As the district court observed, "Why would Republic reimburse Roussel for interest payments he had made on the mortgage unless it had assumed the obligation to make such payments?" 397 F.Supp. at 908–09. Another check was described on Republic's books as a "payment on mortgage loan." In still another instance a check was made directly payable to the Whitney Bank. Furthermore, although the promissory note indicated that Republic would pay taxpayer no less than $25,000 plus interest per month, its payments in 1959 were considerably less than the minimum amount and were "directly related to the payments due to the Whitney Bank under the mortgage," as found by the trial court. *Id.* at 908.

On the other hand, taxpayer's position is supported by the existence of the promissory note, as well as by certain testimony offered at trial. A CPA associated with Republic and taxpayer testified that Republic issued the promissory note after she reviewed the "Act of Sale" and ascertained that the collateral mortgage sought to be assumed under the act of sale could not, in her opinion, be assumed. An officer of the Whitney Bank testified that the bank's records reflect that Republic was never indebted to it. He further testified that taxpayer paid off his loans from the bank on February 20, 1961, and that the mortgage note was surrendered to taxpayer on that date, whereas Republic did not satisfy its obligation to taxpayer until December 30, 1965.[13]

We are convinced that the district court properly held for the government on this issue. Any doubt that we might harbor is dispelled by taxpayer's treatment of the mortgage in the course of this suit. In his initial claim for a refund for 1959, taxpayer *admitted* that Republic had assumed the mortgage as part payment for the leases. Only one month before trial did taxpayer amend his claim to assert that no mortgage obligation had been assumed. As the district court concluded:

> Considering the fact that Roussel had full control over all aspects of the transaction, his own uncertainty as to what transpired served to emphasize the confusing nature

12. In pertinent part the minutes provided:

> The Board discussed the proposed acquisition of the leases owned by Louis J. Roussel in the Valentine Field of Lafourche Parish, Louisiana, and it was recommended that the Corporation acquire such leases from Mr. Roussel at a price of two million dollars, *provided the acquisition could be made on* a basis of fifty thousand dollars ($50,000.00) cash and a *mortgage for the balance of the purchase price.*

(emphasis added).

13. Other evidence undercuts the import of this testimony. By February 1961, the mortgage indebtedness had been reduced to $1,542,-150.11. On February 17, 1961, Roussel executed a new promissory note to Republic in the amount of $1,163,650.11, the proceeds of which he applied toward the satisfaction of the final balance due on the mortgage indebtedness. From that point on, Roussel and Republic paid each other monthly checks under the two promissory notes. Since the amounts of these checks were virtually the same, they offset each other so that, in reality, little, if any, money actually changed hands.

of the sale. Suffice it to say, however, that from the date of the act of sale until one month before trial, Roussel believed Republic had assumed his mortgage liability.

*Id.* at 909.

■ It is axiomatic that we may look through the form in which a taxpayer has cloaked a transaction to the substance of that transaction. *Commissioner v. Court Holding Co.,* 324 U.S. 331, 334, 65 S.Ct. 707, 708, 89 L.Ed. 981 (1944); *Redwing Carriers, Inc. v. Tomlinson,* 399 F.2d 652, 657 (5th Cir. 1958). Taxpayer's belated attempt to transform the assumption of his mortgage into a promissory note leaves us unpersuaded that the parties intended any result other than an assumption of taxpayer's mortgage.[14]

## II. Timeliness of Taxpayer's Claims for Refunds.

■ A taxpayer may not bring suit for a refund unless he has "duly filed [a claim for refund] . . . according to the provisions of law in that regard." 26 U.S.C. § 7422(a). *See United States v. Felt & Tarrant Manufacturing Co.,* 283 U.S. 269, 272, 51 S.Ct. 376, 377, 75 L.Ed. 1025 (1931). To be timely a claim for a refund of an overpayment of taxes must be filed by the taxpayer "within 3 years from the time the return was filed or 2 years from the time the tax was paid, whichever of such periods expires the later . . . ." 26 U.S.C. § 6511(a).[15] However, if the claim is not filed within three years after the return is filed, "the amount of the . . . refund shall not exceed the portion of the tax paid" during the 2 years immediately preceding the filing of the claim. *Id.* § 6511(b)(2)(B).

### A. The 1960 and 1962 Tax Years.

The government contends that taxpayer was barred from making a claim for the refund of taxes for tax years 1960 and 1962. The government reasons as follows: its au-

---

**14.** Taxpayer asserts that if the amount of the mortgage encumbering a piece of property is not credited against the purchase price, then no assumption has taken place. Although the tax court has characterized that event as a circumstance of significant importance, *Stonecrest Corp.,* 24 T.C. 659 (1955), it has never adopted the bald assertion made by taxpayer here. The cases cited by taxpayer are distinguishable from the instant case because the assumption of the mortgage in those cases was specifically placed at a *future* date and certainly was not expressly assumed as in the "Act of Sale" on the instant facts. *See United Pacific Corp.,* 39 T.C. 721 (1963); *E. P. Lamberth Estate,* 31 T.C. 302 (1958); *Stonecrest Corp., supra.*

Taxpayer also alleges that the government, in order to make its position "work," asserted that taxpayer's mortgage on the date of the "Act of Sale" had a balance of exactly $1,950,-000. He asserts that he actually owed the Whitney Bank $1,997,551.21 at that time. However, the $1,950,000 figure is not the government's invention; it is found in taxpayer's "Act of Sale." *See* n. 1, *supra.*

**15.** Section 6511(c)(1) provides that if the taxpayer and the IRS agree to extend the period of assessment of a tax within either of the time periods specified in section 6511(a), the period for filing a claim for a refund, as determined under section 6511(a), "shall not expire prior to 6 months after the expiration of the period within which an assessment may be made pursuant to the agreement . . . ." If a claim is filed after the execution of such an agreement and *within six months after the expiration date* of the agreement,

> the amount of the credit or refund shall not exceed the portion of the tax paid after the execution of the agreement and before the filing of the claim or the making of the credit or refund, as the case may be, *plus the portion of the tax paid within the period which would be applicable under subsection (b)(2) if a claim had been filed on the date the agreement was executed.*

*Id.* § 6511(c)(2) (emphasis added).

The taxpayer and IRS did timely agree to extend the assessment period until June 30, 1972. The taxpayer's refund claim, however, was not filed within six months after the expiration date of the agreement (December 31, 1972). Consequently, the provisions of section 6511(c) do not affect the outcome here.

We note that taxpayer had previously filed refund claims on May 16, 1972, well within the time period specified in section 6511(c). These claims were rejected. Thereafter taxpayer filed a suit that was subsequently dismissed on his motion. Case law is clear that taxpayer's later refund claims could not relate back to his earlier rejected claims. *See Young v. United States,* 203 F.2d 686, 689 (8th Cir. 1953); *Solomon v. United States,* 57 F.2d 150, 152 (2d Cir. 1932). In any event, taxpayer does not rely on these earlier claims.

dit indicated that taxpayer had overpaid his taxes for those years at the time he originally filed his returns; taxpayer made no additional payments for those years at any time thereafter; therefore, taxpayer's August 15, 1973, claims for refund for those tax years were not filed within two years of payment (or three years of filing) as required by section 6511(a).

 The district court found that taxpayer's claims for a refund for 1960 and 1962 *were* filed within two years from the time that the tax for those two years was paid:

> The taxpayer's additional tax liability resulting from the disallowance by the IRS of the disputed deductions and losses is the allegedly erroneous assessment giving rise to the claims for refund. That liability was satisfied or "paid" when the IRS applied the credit the taxpayer otherwise would have received because of his erroneous inclusion of income for the two years in question to satisfy the additional assessments. This offsetting of added tax liability against overpayment must be deemed to constitute payment of the additional tax liability.

397 F.Supp. at 906. This approach was rejected, however, in *Kingston Products v. United States,* 368 F.2d 281, 285–88, 177 Ct.Cl. 471 (1966).

> The difficulty with this argument is that the audit of taxpayer's single . . . tax return for a particular year is not composed of a separate deficiency or overassessment as regards each adjustment, but necessarily results in either a deficiency or an overassessment. [citations omitted] The principle of credit allowances, therefore, "applies *after the offsetting amounts are ascertained and not to their ascertainment." Babcock & Wilcox Co. v. Pedrick,* supra, 212 F.2d

[645] at 648 [(2nd Cir.)]. The principle thus applies only as between different kinds of tax for· a single tax year or against taxes of different years (ibid), so that *a tax is deemed to be paid* if a cash credit of the taxpayer is charged against a determined assessment or *if an overpayment of one year is credited against a deficiency of another year.*[16]

*Id.* at 287 (emphasis added). We are persuaded by the Court of Claims' reasoning that the offsetting of adjustments for a single tax year (1960 or 1962) by the IRS in the instant case does not constitute payment of tax for the purpose of IRC § 6511(a). Accordingly, we conclude, contrary to the district court,[17] that taxpayer is not entitled to recover a refund for either 1960 or 1962.

**B. The 1959, 1961, 1963, 1964, and 1965 Tax Years.**

 The district court held that the amounts of taxpayer's refund for each year could not exceed the amount that he had paid for that year in response to the "Quick Assessments" in 1972.[18] In the court's view, section 6511(b) barred the taxpayer "from claiming a refund in 1973 for taxes paid with the filing of his returns in 1959–66." 397 F.Supp. at 907. We agree. Taxpayer clearly paid his remaining tax liability for those years, as determined by the IRS, on March 13, 1972. His claim for a refund, filed on August 15, 1973, was therefore timely under section 6511(a), having been brought within two years from the time the tax was paid. However, the amount of refund to which taxpayer is entitled is limited by section 6511(b)(2) to the portion of the tax that he paid within the two years preceding August 15, 1973— namely, to the amounts of the deficiencies that he paid in cash, or by the application of credits from other years,[19] in 1972.

---

**16.** Under this rationale, the application of taxpayer's overpayments to satisfy his liability for 1959 constitutes payment for *1959* tax year. *See* n. 19 *infra.*

**17.** The district court determined that taxpayer was entitled to a refund of $1,644.07 for 1960 and $12,573.81 for 1962.

**18.** *See* notes 5 and 8, *supra.*

**19.** "[A] tax is deemed to be paid . . . if an overpayment of one year is credited against a deficiency of another year." *Kingston Products,* 368 F.2d at 287. Because the IRS credited the overpayments from taxpayer's 1960 and 1962 tax years to the deficiency assessed for

Taxpayer contends that the years 1959–66 should be treated as one unit rather than as separate tax years for the purpose of the statute of limitations. Accordingly, he concludes that he is entitled to a refund of the total amount of his overpayments as determined by the district court ($511,878.03) because he paid a greater sum ($710,656.01 plus a credit of $20,441.25) within the two years preceding his filing claims for refunds. Taxpayer cites as authority *Plankinton v. United States,* 267 F.2d 278 (7th Cir. 1959), and relies in particular on the following quotation:

> The Government concedes that generally remittances made *prior to the time the taxpayer's liability is defined* do not constitute "payment" of a tax for the purpose of commencing the limitation period on refund claims. It recognizes that such is the holding of *Rosenman v. United States,* 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535; [other citations omitted].

*Id.* at 280 (emphasis added). *Plankinton,* however, involved the payment of *estimated* income taxes; as the court there noted, the predecessor of section 6511(b) (section 322(b) of the Internal Revenue Code of 1939) was not intended to preclude a refund of estimated taxes, which were simply payments "on account." In the instant case, however, the taxpayer himself defined his tax liability when he filed his returns for the years 1959–66. His remittance with each return was not merely a payment "on account" but was intended to discharge

what the taxpayer deemed to be his tax liability. *Plankinton* is thus inapplicable here.[20]

**[9, 10]** We discern no reason to depart from the long-accepted principle that taxes are computed on an annual basis. *See* 26 U.S.C. § 441(a); *Burnet v. Sanford & Brooks Co.,* 282 U.S. 359, 363, 51 S.Ct. 150, 151, 75 L.Ed. 383 (1931). As the Supreme Court noted in *Commissioner v. Sunnen,* 333 U.S. 591, 598, 68 S.Ct. 715, 719, 92 L.Ed. 898 (1948): "Income taxes are levied on an annual basis. Each year is the origin of a new liability and of a *separate cause of action.*" (emphasis added). By his conduct taxpayer implicitly acknowledged that each tax year was to be treated separately: although he paid the asserted deficiencies for tax years 1959, 1961, 1963, 1964, and 1965 on the same day, he made a separate payment for each year; moreover, he filed a separate claim for a refund for each individual year.

In light of the foregoing discussion, we find that the district court correctly treated each tax year separately and limited the amount of taxpayer's refund for each year to the amount that taxpayer paid *for that year* in 1972. Because the amount of overpayment determined by the court for 1961 ($71,233.29) exceeded the sum of $31,756.98 that taxpayer had paid for that year in 1972, the district court properly limited the amount of the refund for 1961 to $31,756.98. The same reasoning applies to tax years 1963, 1964, and 1965. On the other hand, because the amount of the overpayment for

his *1959* tax year on March 13, 1972, taxpayer's August 15, 1973, claim for a refund of these overpayments was made within two years of the time his 1959 tax was paid. Accordingly, taxpayer's 1960 and 1962 credits are treated like any cash payment made by taxpayer to satisfy his deficiency for 1959, and he can recover a refund of them to the extent that he overpaid his 1959 tax.

**20.** *Rosenman v. United States,* 323 U.S. 658, 65 S.Ct. 536, 89 L.Ed. 535 (1944), cited in *Plankinton,* clearly indicates that taxpayer's argument must fail. In that case the taxpayer-estate deposited $120,000 with the government in anticipation of its estate tax liability, which had not yet been determined. The money was placed in a "suspense account." After a return was filed the IRS withdrew the amount specified on

the return from the account. Later the Commissioner assessed a deficiency against the estate that was satisfied by the balance of the suspense account. The Supreme Court held that the initial deposit was not a payment of tax but that the applications of funds in the suspense account were payments. In reaching this conclusion the Court carefully distinguished interim payments from payments made to discharge what the IRS asserted was, or *what the taxpayer deemed to be,* a tax liability. *Id.* at 662, 65 S.Ct. at 538 (emphasis added). In the instant case the taxpayer paid what he deemed to be his tax liability when he filed his tax returns. He therefore cannot claim the benefit of cases like *Rosenman* and *Plankinton* that involve merely "interim arrangements." *Id.*

1959, as determined by the court ($602.08), was less than the amount of the deficiency assessed and paid for that year in 1972 ($482,722.82), the district court properly included only the amount of the overpayment in its judgment. The same is true for tax year 1966. Thus, although the taxpayer had overpaid his taxes for tax years 1959–66 in the amount of $511,878.03, the district court concluded that he was entitled to recover only $242,753.15, plus interest. Because we have determined in Part II.A., *supra*, that taxpayer was not entitled to recover for tax years 1960 and 1962, the taxpayer is properly entitled to a refund in the amount of $228,535.27, plus interest.

 Taxpayer urges us to grant him relief on equitable grounds. However, "general principles of equity may not override statutory requirements for timely filing of tax refund claims." *Kingston Products, supra* at 288. *Accord Young v. United States*, 203 F.2d 686, 689 (8th Cir. 1953).

 Taxpayer's reliance on the mitigation provisions of the Code, 26 U.S.C. §§ 1311–1315, is also misplaced. For those provisions to apply there must have been "a decision by the Tax Court or a judgment, decree, or other order by any court of competent jurisdiction, *which has become final.*" *Id.* § 1313(a)(1) (emphasis added). A district court opinion is not final when it is entered but becomes final only after it has been appealed. *Benenson v. United States*, 385 F.2d 26, 30 (2d Cir. 1967). Taxpayer must therefore bring a separate mitigation action at the conclusion of his appeal if he seeks to mitigate the judgment below.[21]

The judgment of the district court is

AFFIRMED in part and

REVERSED in part.

---

**21.** Of course, we express no view as to whether taxpayer ought to prevail in a future mitigation action.