107 T.C. No. 4


UNITED STATES TAX COURT


CHARLES H. DAVISON AND LESSIE B. DAVISON, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent


Docket No. 15887-94.                    Filed August 26, 1996.


        W, a cash basis partnership, entered into an
agreement in 1980 to borrow up to $29 million from J.
J made an initial disbursement of $19,645,000.
Pursuant to the loan agreement, J applied $227,647.22
of the initial disbursement as a credit for interest W
owed to J on a previous loan.  Pursuant to a subsequent
modification of the 1980 loan agreement, J agreed to
advance $1,587,310.46 to W to enable W to satisfy its
current interest obligation to J.  J made a wire
transfer of $1,587,310.46 to W's bank account on Dec.
30, 1980.  On Dec. 31, 1980, W made a wire transfer to
J to satisfy W's current interest obligation.  The net
effect of the Dec. 30-31 transaction was to increase
the principal amount of W's loan from J by
$1,587,310.46.  W claimed interest deductions of
$227,647.22 and $1,587,310.46 and reported an ordinary
loss on its partnership return for 1980.

R disallowed W's interest deductions, determining that the interest had not been "paid" but merely postponed.  R adjusted Ps' distributive share of W's ordinary loss accordingly.

Held:  W is not entitled to interest deductions under sec. 163(a), I.R.C.  A cash basis borrower is not entitled to an interest deduction where the funds used to satisfy the interest obligation were borrowed for that purpose from the same lender to whom the interest obligation was owed.  In those circumstances, there has been no "payment" of interest; rather, "payment" has merely been postponed.

John S. Brown, George P. Mair, William A. Hazel, Matthew D. Schnall, Donald-Bruce Abrams, and Joseph L. Kociubes, for petitioners.

Charles W. Maurer, Jr., for respondent.

OPINION

RUWE, Judge:  Respondent determined deficiencies of $753 and $402,169 in petitioners' 1977 and 1980 Federal income taxes, respectively.  After a concession by respondent, the issue for decision is whether White Tail, a general partnership, "paid" interest when it borrowed the funds used to satisfy its interest obligations from the same lender to whom the interest was owed. Petitioner Charles H. Davison was a partner in White Tail, and petitioners claimed their distributive share of the ordinary loss reported by White Tail on their 1980 Federal income tax return.

## Background

This case was submitted fully stipulated. The stipulation of facts and the first supplemental stipulation of facts are incorporated herein by this reference. Petitioners resided in Greenwich, Connecticut, at the time they filed their petition. Petitioners were calendar year, cash basis taxpayers.

Petitioner Charles H. Davison is a certified public accountant. During 1979, he was head partner of the accounting firm Peat, Marwick & Mitchell, where he was associated with Samuel J. Esposito and John L. Vitale, who were also partners.

On February 1, 1979, Messrs. Davison, Esposito, and Vitale formed White Tail, a general partnership organized under Illinois law, for the purpose of entering into the agricultural business of acquiring, cultivating, and selling farm properties. Each of the partners had a one-third interest in the profits, losses, and distributions of White Tail. White Tail reported its income on a calendar year basis using the cash method of accounting.

On or about March 16, 1979, White Tail acquired approximately 11,000 acres of real property located in Hyde County, North Carolina, and certain related personal property. On or about May 2, 1980, White Tail acquired approximately 7,747 acres of real property located in Hyde and Tyrrell Counties in North Carolina.

In 1979, White Tail realized $248,198 in gross revenues from farming operations and incurred $868,684 in operating expenses, exclusive of interest expense.  In 1980, White Tail realized $2,098,717 in gross revenues from farming operations and incurred $2,784,169 in operating expenses, exclusive of interest expense.

## White Tail's Credit Arrangements With John Hancock

On December 21, 1978, the John Hancock Mutual Life Insurance Co. (John Hancock) issued to Messrs. Davison, Esposito, and Vitale a commitment to make a first mortgage loan on the White Tail property in an amount up to $9 million.[1]  By a promissory note dated March 16, 1979, White Tail and John Hancock established the credit arrangement contemplated by this $9 million mortgage loan commitment.[2]  Subsequently, on January 28, 1980, John Hancock issued to White Tail a First Mortgage Loan Commitment pursuant to which John Hancock agreed to advance White Tail a maximum amount of $29 million.  The First Mortgage Loan

---

[1]This commitment preceded the actual formation of White Tail and its acquisition of property.

[2]In connection therewith, White Tail executed a Deed of Trust and Security Agreement.  Messrs. Davison, Esposito, and Vitale also executed a Guaranty of Note, Deed of Trust and Mortgage in the amount of $1 million, with the maximum individual liability of each guarantor limited to one-third of this amount. In addition, Brad Hill Farms (Brad Hill), another partnership of Messrs. Davison, Esposito, and Vitale, executed a mortgage of certain Illinois real property as further security for the $9 million promissory note.  White Tail and John Hancock modified their agreement with a Modification of Promissory Note and Deed of Trust and Security Agreement, dated Dec. 4, 1979.

Commitment required that White Tail use a portion of the funds borrowed to retire existing indebtedness to John Hancock,[3] and envisioned that additional amounts would be advanced to White Tail up to the aggregate principal amount of $29 million.

By a promissory note dated May 2, 1980, White Tail and John Hancock established the 1980 John Hancock credit arrangement (the 1980 credit arrangement), as contemplated by the First Mortgage Loan Commitment.[4] This promissory note required White Tail to pay interest on its borrowings at an annual rate of 12.25 percent, payable every January 1 commencing January 1, 1981. The promissory note also entitled John Hancock to 20 percent of White Tail's net farm income, as well as 20 percent of White Tail's net profits from land sales.

Pursuant to the establishment of the 1980 credit arrangement, John Hancock made initial disbursements on May 7, 1980, totaling $19,645,000. A portion of the $19,645,000

---

[3]The First Mortgage Loan Commitment stated that White Tail's existing indebtedness to John Hancock was $6 million.

[4]In connection with the execution of the May 2, 1980, promissory note and the establishment of the 1980 credit arrangement, White Tail executed a Deed of Trust and Security Agreement and an Option Agreement. Moreover, each of White Tail's partners executed a Guaranty of Note, Deed of Trust and Mortgage. The Guaranty of Note provided that each partner guaranteed the payment of one-third of the amount owed under the 1980 credit arrangement, up to a maximum amount of $1 million. Brad Hill also executed a Guaranty of Note, Deed of Trust and Mortgage. The Deed of Trust and Security Agreement was amended by an Amendment to Deed of Trust and Security Agreement, dated Aug. 26, 1980.

consisted of a credit to White Tail's prior loan account with John Hancock for $6,480,000 to pay off the principal that White Tail owed pursuant to the prior credit arrangement, and a credit to White Tail's prior loan account for $227,647.22 to satisfy the interest obligation that had accrued on the prior loan.

The 1980 credit arrangement required White Tail to make an interest payment on January 1, 1981. The amount of interest due was $1,587,310.46. Pursuant to the terms of the 1980 credit arrangement, one-half of the interest could be borrowed from John Hancock. The 1980 credit arrangement also called for a principal payment of $7,707.50 on the same date.

White Tail needed to satisfy the requirements set forth in the First Mortgage Loan Commitment in order to become eligible to make additional borrowings under the 1980 credit arrangement. These additional borrowings were characterized as "Land Development" and "Operating Funds" borrowings. Under the terms of the First Mortgage Loan Commitment, the 1980 disbursement for "Operating Funds" was subject to the following provision:

> If the Borrower's Net Farm Income is insufficient to fund the interest accrued on the loan contemplated herein from date of closing to December 31, 1980, John Hancock shall disburse sufficient proceeds of this loan to fund said interest shortage; provided, however, that the amount of said Disbursement for Operating Funds shall not exceed 50% of the actual accrued interest during said period, and provided further that John Hancock's said Disbursement for such interest shortage shall not be disbursed until Borrower has advanced its portion of the actual accrued interest.

Similar provisions covered the disbursement of operating funds for 1981-83.  The 1980 credit arrangement remained in effect from May 2, 1980, through June 1983.

White Tail's business was unprofitable,[5] and, in December 1980, Mr. Esposito requested that John Hancock modify the terms of the 1980 credit arrangement in order to prevent a default.  On December 24, 1980, John Hancock mailed a Letter of Agreement (Letter Agreement) to White Tail c/o Mr. Esposito.  The Letter Agreement states:

> Gentlemen:
>
> Reference is made to the enclosed Vote #3, Page Three approved December 23, 1980 by our Agricultural Investment Committee, and approved today by our Committee of Finance, in which vote we have authorized the Modification of the legal papers evidencing and securing the above referenced loan.
>
> Said Modification will capitalize certain interest due from you on January 1, 1981 and will defer certain principal due from you on the same date, all as set forth in said vote.  Said Modification will further increase John Hancock's participation in the property's defined Operating Income and in the Security's Appreciation, also all as set forth in said enclosed Vote.
>
> &ast;   &ast;   &ast;   &ast;   &ast;   &ast;   &ast;
>
> You have asked us to enter into this Letter of Agreement with you this week, in advance of our referrel [sic] to counsel and his preparation of the definitive documentation, in order to prevent a default in your payment due January 1, 1981.

---

[5]See supra p. 4.

> If this Letter of Agreement is to become effective, you must sign the enclosed copy hereof and return the same to me at the Home Office, so that the same is received by me prior to December 31, 1980.

Attached to the Letter Agreement were the minutes from a December 23, 1980, meeting of John Hancock's Agricultural Investment Committee stating that the committee voted to accept the following modification of the 1980 credit arrangement:

> To capitalize $793,655.23 of the $1,587,310.46 interest due January 1, 1981 and to defer the $7,707.50 principal installment due January 1, 1981 until January 1, 2001, the final maturity under FML [Farm Mortgage Loan] #161177, White Tail Farm, 19,344 acres secured by a First Mortgage loan in North Carolina and Illinois in consideration of White Tail Farm providing John Hancock Participation as follows:

> Between July 1, 1981 and January 1, 1991[,] 22% of Net Farm Income and 22% of the Net Profit From Land Sales[;]

> and

> Between January 2, 1991 and January 1, 2001[,] 25% of Net Farm Income and 25% of the Net Profit From Land Sales over Value Assigned To Land;

> rather than 20% of Net Farm Income and 20% of the Net Profit From Land [Sales] as originally provided.

Mr. Esposito signed the Letter Agreement on behalf of White Tail.

On December 30, 1980, John Hancock made a wire transfer of $1,587,310.46 to White Tail's account at the American National Bank and Trust Co. of Chicago (American National). This transfer increased the amount White Tail owed to John Hancock by $1,587,310.46. This amount is reflected as a deposit into the

American National account on December 30, 1980.  On December 31, 1980, White Tail made a wire transfer of $1,595,017.96 to John Hancock, representing $7,707.50 of principal and $1,587,310.46 in interest due under the 1980 credit arrangement.[6]

The purpose of the $1,587,310.46 advance from John Hancock was to provide White Tail with sufficient funds to satisfy the interest due John Hancock on January 1, 1981, under the terms of the 1980 credit arrangement, as modified.  White Tail's general ledger showed that its bank account at American National, as of December 31, 1980, was overdrawn with a negative balance of $138,931.80.[7]

On their 1980 Federal income tax return, petitioners reported an ordinary loss of $946,613 as their distributive share of the $2,839,839.09 ordinary loss reported by White Tail on its U.S. Partnership Return of Income (Form 1065) for 1980.  On June 6, 1994, respondent issued a notice of deficiency adjusting petitioners' distributive share of the ordinary loss reported by White Tail.[8]  In particular, respondent disallowed the interest

---

[6]There is no explanation of why the $7,707.50 principal payment was not deferred in accordance with the modification of the 1980 credit arrangement.

[7]This amount includes outstanding checks that had been written on, but had not yet cleared, White Tail's American National account.  This amount is also shown as a liability on White Tail's 1980 U.S. Partnership Return of Income (Form 1065).

[8]Respondent also adjusted petitioners' medical expense deduction for 1980 in the amount of $10,029 and their investment
(continued...)

deductions for amounts that White Tail claimed to have "paid" to John Hancock on May 7 and December 31, 1980, in the respective amounts of $227,647.22 and $1,587,310.46.[9]  Respondent adjusted petitioners' distributive share of White Tail's ordinary loss accordingly.

## Discussion

Before we analyze the transactions in issue, it is appropriate to state some general principles with respect to interest deductions.  Section 163(a)[10] generally permits a deduction for "all interest paid or accrued within the taxable year on indebtedness."  For cash basis taxpayers, payment must be made in cash or its equivalent.  Don E. Williams Co. v. Commissioner, 429 U.S. 569, 577-578 (1977); Eckert v. Burnet, 283 U.S. 140, 141 (1931); Menz v. Commissioner, 80 T.C. 1174, 1185 (1983).  The delivery of a promissory note is not a cash equivalent but merely a promise to pay.  Helvering v. Price, 309

---

[8](...continued)
tax carryback to 1977 in the amount of $753.  Both of these items are computational adjustments.

[9]Respondent also disallowed an interest deduction for $17,897.04 that was borrowed from John Hancock and paid to J.H. Cochrane.  Respondent now concedes that White Tail is entitled to a deduction for its interest payment of $17,897.04 to J.H. Cochrane.

[10]Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the taxable years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

U.S. 409, 413 (1940); Nat Harrison Associates, Inc. v. Commissioner, 42 T.C. 601, 624 (1964).  Where a lender withholds a borrower's interest payment from the loan proceeds, the borrower is considered to have paid interest with a note rather than with cash or its equivalent and, therefore, is not entitled to a deduction until the loan is repaid.  Menz v. Commissioner, supra at 1186; Cleaver v. Commissioner, 6 T.C. 452, 454, affd. 158 F.2d 342 (7th Cir. 1946).  On the other hand, where a taxpayer discharges interest payable to one lender with funds obtained from a different lender, the interest on the first loan is considered paid when the funds are transferred to the first lender.  Menz v. Commissioner, supra; Crown v. Commissioner, 77 T.C. 582, 593-595 (1981).  With these general principles in mind, we proceed to look at the specific transactions in issue.  Because the December 30-31, 1980, transaction presents the more difficult issue, we address it first.

Under the terms of the 1980 credit arrangement, an interest payment and a principal installment were due from White Tail on January 1, 1981.  In the 1980 credit arrangement, John Hancock had agreed to lend White Tail up to 50 percent of the interest that was due, so long as White Tail was able to provide the remaining 50 percent.  In December 1980, Mr. Esposito, one of White Tail's general partners, approached John Hancock and requested that it agree to modify the 1980 credit arrangement with respect to the required interest payment, in order to

prevent a default by White Tail.  In the Letter Agreement dated December 24, 1980, it was agreed that John Hancock would modify the 1980 credit arrangement so as to "capitalize" $793,655.23 of the $1,587,310.46 interest due from White Tail and defer the due date for the principal installment until January 1, 2001.[11]  In the original 1980 credit arrangement, John Hancock had already agreed to lend one-half of the interest due on January 1, 1981. The effect of the modification was that all the interest due to John Hancock on January 1, 1981, would be borrowed from John Hancock.

On December 30, 1980, John Hancock wired $1,587,310.46 to White Tail's account at American National.  This increased the amount White Tail owed John Hancock by $1,587,310.46.  On December 31, 1980, White Tail wired John Hancock $1,595,017.96, which John Hancock reflected as a satisfaction of White Tail's January 1, 1981, interest obligation of $1,587,310.46 plus a principal payment of $7,707.50.[12]

---

[11]We construe the term "capitalize", as used in the Letter Agreement and the minutes, to mean that the principal of the loan would be increased by the amount of interest due on Jan. 1, 1981.

[12]The Letter Agreement dated Dec. 24, 1980, and the attached minutes indicate that John Hancock was going to allow White Tail to defer the principal payment of $7,707.50.  Nevertheless, on Dec. 29, 1980, John Hancock billed White Tail for both principal and interest, and the wire transfer of $1,595,017.96 includes a principal payment of $7,707.50.  The record contains no explanation for this.

The purpose of John Hancock's $1,587,310.46 advance to White Tail on December 30, 1980, was to provide White Tail with sufficient funds to satisfy the interest due John Hancock on January 1, 1981. Petitioners argue that White Tail paid this interest when it made the wire transfer to John Hancock on December 31, 1980. Respondent contends that interest has not been paid but merely postponed, and, consequently, White Tail is not entitled to a deduction under section 163(a).

On brief, petitioners place particular reliance on prior decisions of this Court in which the deductibility of interest paid to a lender, with funds borrowed from the same lender, turns on whether the borrower exercised "unrestricted control" over the funds borrowed. Petitioners argue that they are entitled to a deduction pursuant to section 163(a), because White Tail possessed unrestricted control of the $1,587,310.46 wired from John Hancock to White Tail's account at American National on December 30, 1980.

The concept of "unrestricted control" in cases of this nature had its origin in Burgess v. Commissioner, 8 T.C. 47 (1947). In Burgess, a cash basis taxpayer originally borrowed $203,988.90. On December 20, 1941, just prior to the due date of his interest payment, the taxpayer borrowed an additional $4,000 from the same lender, deposited the lender's check in the taxpayer's checking account, and commingled the $4,000 with other funds in the account. On December 26, 1941, the taxpayer drew a

check on this account in the amount of $4,219.33 to cover $4,136.44 of interest due on the original loan plus $82.89 of prepaid interest on the $4,000 loan. At the time the taxpayer's check was drawn, the taxpayer had $3,180.79 in his account in addition to the $4,000 borrowed on December 20, 1941.

In a Court-reviewed opinion, we allowed the deduction. We rejected the Commissioner's argument that the taxpayer had simply substituted a note in place of the interest payable. We found that the taxpayer did not apply for the loan for the sole purpose of obtaining funds to pay interest, and the lender did not grant the loan for that exclusive purpose. We also found that the taxpayer had several bills that were due, needed sufficient funds to pay them as well as the interest, and commingled the loan proceeds with other funds in his account, causing them to lose their identity. As a result, we found that the loan proceeds could not be traced to the payment of interest. Id. at 50.

Six judges dissented from the majority's holding. They believed that the facts demonstrated that the taxpayer borrowed the $4,000 for the purpose of paying interest. They believed that the substance of what occurred was no different than where a taxpayer simply executes a note to the lender in satisfaction of the current interest obligation.

In Burgess v. Commissioner, supra, the purpose of the second loan was obviously an important factor. However, our subsequent opinions relying on Burgess began to focus mostly on whether the

borrower acquired possession or control over the proceeds of the second loan. This was later referred to as unrestricted control. See Menz v. Commissioner, 80 T.C. at 1187.

In Burck v. Commissioner, 63 T.C. 556 (1975), affd. on other grounds 533 F.2d 768 (2d Cir. 1976), a cash basis taxpayer borrowed $5,388,600 from a bank on December 29, 1969. Pursuant to negotiations that preceded the loan agreement, $1 million of these proceeds was deposited into the taxpayer's account at a second bank. Prior to this deposit, the taxpayer's other funds in the account totaled $42,009.02. On December 30, 1969, pursuant to the negotiated agreement between the lender and the taxpayer, $377,202 was transferred from the taxpayer's account back to the lender for 1 year's prepaid interest on the loan.

We concluded that the facts in Burck were within the scope of our decision in Burgess v. Commissioner, supra, and allowed the interest deduction. In reaching this decision, we relied primarily on the fact that the loan proceeds were commingled with the other funds in the taxpayer's account. We also pointed out that the taxpayer owned other assets from which the interest could have, if need be, been prepaid, even though the taxpayer's bank account contained insufficient funds to pay the interest.[13]

_____

[13]The Court considered the taxpayer's nonliquid assets in making this determination, even though there was no indication that these assets could have been liquidated to make the required interest prepayment in December 1969. See Burck v. Commissioner, 63 T.C. 556, 557 n.2 (1975), affd. on other grounds 533 F.2d 768

(continued...)

We also considered the fact that prepayment of the $377,202 in interest was an "integral part" of the loan agreement because the bank would not have made the loan without it.  It was clear that $377,202 of the loan proceeds was advanced for the purpose of paying interest to the lender.

Faced with essentially the same fact pattern in <u>Wilkerson v. Commissioner</u>, 70 T.C. 240 (1978), revd. and remanded 655 F.2d 980 (9th Cir. 1981), we followed the reasoning and result of <u>Burck v. Commissioner</u>, <u>supra</u>.[14]  Responding to the Commissioner's argument that the borrowers never had "unrestricted control" over the loan proceeds, we stated:

> We have rejected that same argument where the lender gave up control of the borrowed funds, the funds were commingled with the taxpayer's own funds, and then the commingled funds were used to prepay interest. <u>Burgess v. Commissioner</u>, 8 T.C. 47 (1947); <u>Burck v. Commissioner</u>, 63 T.C. 556 (1975), affd. 533 F.2d 768 (2d Cir. 1976).  [<u>Wilkerson v. Commissioner</u>, <u>supra</u> at 258].

In <u>Wilkerson</u>, without the loan, the borrowers did not have sufficient funds with which to satisfy their interest obligations.  Prior to receipt of the loan proceeds used to satisfy their interest obligations, the borrowers had checking

---

[13](...continued)
(2d Cir. 1976).

[14]In <u>Wilkerson v. Commissioner</u>, 70 T.C. 240, 259 (1978), revd. and remanded 655 F.2d 980 (9th Cir. 1981), we stated that "The <u>Burgess</u> and <u>Burck</u> cases are not meaningfully distinguishable from the facts before us."

account balances of $2 and $1,873, respectively, while their respective interest payments were approximately $55,000. In response to the Commissioner's argument that there was insufficient commingling, we stated:

> The partnerships here acquired control of the loan proceeds as evidenced by their deposit in the partnership checking accounts outside the lender's domain. That the partnerships exercised their control over the funds for only a brief period of time does not convert the transactions into discounted loans. [Id. at 260.]

In Wilkerson, unrestricted control appears to mean unrestricted physical or mechanical control in the sense that there were no physical or mechanical restraints on the borrower's ability to withdraw borrowed funds for a purpose other than paying interest.[15] Used in this sense, "unrestricted control" ignores the fact that the borrower may have obligated himself to use the loan proceeds to pay interest to the lender as a precondition to the loan, and also ignores the fact that failure to use loan proceeds for the purpose of satisfying a current interest obligation would result in a default and likely foreclosure proceedings.

Two Courts of Appeals have rejected this application of an "unrestricted control" rule. Wilkerson v. Commissioner, 655 F.2d

---

[15]We found as a fact that the partnerships had "unrestricted physical control" over the loan advances when they were deposited to the partnerships' accounts. Wilkerson v. Commissioner, supra at 244, 249.

980 (9th Cir. 1981); Battelstein v. IRS, 631 F.2d 1182 (5th Cir. 1980)(en banc).[16]  In Battelstein, the lender agreed to make advances to cover the taxpayers' quarterly interest payments on a $3 million loan.  The taxpayers never paid interest except by way of these advances.  The lender notified the taxpayers each quarter of the amount of interest that was due; the taxpayers would then send a check for this amount, and the lender would send the taxpayers a check for an identical amount.

The Court of Appeals for the Fifth Circuit concluded that the check exchanges between the lender and borrower were plainly for no purpose other than to finance the taxpayers' current interest obligations and, therefore, denied the interest deduction.  In rejecting the taxpayers' reliance on the fact that actual checks were exchanged, the Court of Appeals stated:

---

[16]In addition, judges of two other Courts of Appeals, although not faced with the issue, have, in dicta, criticized our application of the rule.  See Burck v. Commissioner, 533 F.2d 768 (2d Cir. 1976); Goodstein v. Commissioner, 267 F.2d 127 (1st Cir. 1959), affg. 30 T.C. 1178 (1958).  In Burck v. Commissioner, supra, the Court of Appeals for the Second Circuit affirmed our decision, but it did not consider the issue presented here.  In a portion of the opinion where he was writing "for himself only", Judge Oakes noted that he disagreed with our decision permitting an interest deduction.  Id. at 770 n.3.  Judge Oakes viewed the transaction at issue "as having the effect of creating a 'discounted loan,'" and he concluded "that there was no payment of interest by taxpayer within the meaning of 26 U.S.C. § 163(a) until actual repayment of the loan."  Id.  Judge Oakes further noted his agreement with the dissenting opinion in Burgess v. Commissioner, 8 T.C. 47 (1947).  Id.; see also Goodstein v. Commissioner, supra at 131 (noting in dicta that it considers the reasoning of the dissent in Burgess v. Commissioner, supra, to be the "more persuasive").

In ignoring these exchanges, we merely follow a well-established principle of law, viz., that in tax cases it is axiomatic that we look through the form in which the taxpayer has cloaked a transaction to the substance of the transaction.  See, e.g., <u>Republic Petroleum Corp. v. United States</u>, 613 F.2d 518, 524 (5th Cir. 1980); <u>Redwing Carriers, Inc. v. Tomlinson</u>, 399 F.2d 652, 657 (5th Cir. 1968) (citing cases).  As the Supreme Court stated some years ago in <u>Minnesota Tea Co. v. Helvering</u>, 302 U.S. 609, 58 S. Ct. 393, 82 L.Ed. 474 (1938), "A given result at the end of a straight path is not made a different result because reached by following a devious path."  302 U.S. at 613, 58 S. Ct. at 394.  The check exchanges notwithstanding, the Battelsteins satisfied their interest obligations to Gibraltar by giving Gibraltar notes promising future payment.  The law leaves no doubt that such a surrender of notes does not constitute payment for tax purposes entitling a taxpayer to a deduction.  [<u>Id.</u> at 1184.]

The Court of Appeals rejected the taxpayers' reliance on <u>Burgess v. Commissioner</u>, 8 T.C. 47 (1947).  The Court of Appeals determined that even if <u>Burgess</u> constituted good law, it was limited to cases where the purpose of a subsequent loan was not apparent (i.e., whether it was to finance interest payments on a previous loan for which deductions are being claimed, or whether it was to fulfill some other unrelated objective).  The Court of Appeals held that "If the second loan was for the purpose of financing the interest due on the first loan, then the taxpayer's interest obligation on the first loan has not been paid as Section 163(a) requires; it has merely been postponed." <u>Battelstein v. IRS</u>, <u>supra</u> at 1184.

In <u>Wilkerson v. Commissioner</u>, 655 F.2d at 982, the Court of Appeals relied on <u>Battelstein v. IRS</u>, <u>supra</u>, and denied the

interest deduction, because a portion of the loan proceeds was "specifically earmarked" for the purpose of paying the interest due.  The Court of Appeals stated that "The fact that the loan proceeds were run through the taxpayers' bank account in a transaction intended to take not more than one business day, does not affect the substance of the transaction."  Wilkerson v. Commissioner, supra at 983.  Moreover, the Court of Appeals explained that "A careful reading of Burgess v. Commissioner, 8 T.C. 47 (1947), indicates that it involved two separate loan transactions in which the proceeds of the second loan were not earmarked for the purpose of payment of interest on the first loan."  Id.

Shortly after the reversal in Wilkerson v. Commissioner, supra, we acknowledged the confusion in this area brought about by the disparity of results among cases of similar economic impact.  Menz v. Commissioner, 80 T.C. at 1187.  In Menz, we summarized this Court's previous application of the "unrestricted control" test as follows:

> Where a lender gives up control of borrowed funds, the funds are commingled with the taxpayer's other funds in an account at an institution separate from the lender, and the interest obligation is satisfied with funds from that separate account, there has been a payment of interest under section 163(a).  * * *  [Id. at 1187; citations omitted.[17]]

---

[17]Despite this test for determining "unrestricted control", consideration of the borrower's purpose for acquiring the
(continued...)

In <u>Menz</u>, we found that the taxpayer had not received unrestricted control over the funds borrowed for the purpose of paying interest. We based this conclusion on the following facts: (1) The loan to the borrower, the deposit into the borrower's checking account, and the retransfer of the funds to the lender were all simultaneous; (2) the remaining funds in the borrower's account with which it could have paid the interest in question were de minimis; (3) the loans were made solely for the purpose of paying the interest owed to the lender; (4) the borrowed funds were easily traceable through the borrower's account to the asserted interest payments; and (5) a wholly owned subsidiary of the lender was a 1-percent general partner of the borrower and possessed approval power over all the borrower's major transactions. The fifth factor is the only one that was not present in <u>Wilkerson</u>.

The 1-percent partner did not have signatory authority over the bank account into which the borrowed funds were deposited. <u>Menz v. Commissioner</u>, <u>supra</u> at 1190. Nevertheless, we found that the borrower lacked "unrestricted control", because the 1-percent general partner of the borrower was controlled by the lender and could have terminated the borrower's existence if it had failed to use the borrowed funds to satisfy interest obligations owed to

---

[17](...continued)
additional funds was never completely disregarded. See <u>Menz v. Commissioner</u>, 80 T.C. 1174, 1187 n.16 (1983).

the lender.  We found that the 1-percent partner's control over the future of the partnership was too fundamental and significant to conclude that the partnership's control over the funds in its account was unrestricted.  Id. at 1192.

We think that similar fundamental and significant factors restricted White Tail's control over the $1,587,310.46 that John Hancock wired to White Tail's account on December 30, 1980. White Tail had specifically agreed to borrow this amount to satisfy its interest obligation in order to prevent a default. Use of the funds for any other purpose would have breached the terms of its agreement with John Hancock and would have resulted in White Tail's default and a likely end to its business operations.[18]  In Wilkerson, we chose not to consider the impact of a default and its consequences on whether the borrower had unrestricted control over funds that it borrowed.[19]  See Wilkerson v. Commissioner, 70 T.C. at 244-245.  However, in Menz,

---

[18]The existence of such an agreement has been held to restrict the borrower's control over borrowed funds.  See Franco v. Commissioner, T.C. Memo. 1992-577.

[19]As we stated in Menz v. Commissioner, 80 T.C. at 1191-1192:

> we chose not to address what impact a default would have had, and found as fact that the borrower had been given "unrestricted physical control over the loan advance at the time it was deposited in the [borrower's] account."  70 T.C. at 244.  On that basis, we held that the taxpayer's situation in Wilkerson was not meaningfully distinguishable from the Burgess and Burck cases and found that there had been the requisite "payment" of interest.

we expanded our analysis and considered factors beyond physical control over the borrowed funds. Similarly, in this case, we cannot ignore the reality that a borrower who borrows funds for the purpose of satisfying an interest obligation to the same lender in order to avoid a default does not have unrestricted control over the borrowed funds in any meaningful sense. In light of our expanded view of the considerations that must be taken into account in determining whether a borrower has unrestricted control over borrowed funds, our earlier opinions in Burgess, Burck, and Wilkerson, have been sapped of much of their vitality.[20]

The issue before us arises when a borrower borrows funds from a lender and immediately satisfies an interest obligation to the same lender. In order to determine whether interest has been paid or merely deferred, it is first necessary to determine whether the borrowed funds were, in substance, the same funds used to satisfy the interest obligation. Whether the relevant transactions were simultaneous, whether the borrower had other funds in his account to pay interest, whether the funds are traceable, and whether the borrower had any realistic choice to use the borrowed funds for any other purpose would all be

_____

[20]Recent opinions indicate that an expanded "unrestricted control" test will likely produce the same result as the test applied in the Fifth and Ninth Circuit Courts of Appeals. See Alexander v. Commissioner, T.C. Memo. 1995-334; Blumeyer v. Commissioner, T.C. Memo. 1992-647; Franco v. Commissioner, supra.

relevant to this issue.  Once it is determined that the borrowed funds were the same funds used to satisfy the interest obligation, the purpose of the loan plays a decisive role.

In light of the foregoing analysis, we hold that a cash basis borrower is not entitled to an interest deduction where the funds used to satisfy the interest obligation were borrowed for that purpose from the same lender to whom the interest was owed. This test is consistent with our traditional approach of characterizing transactions on a substance-over-form basis by looking at the economic realities of the transaction.  We agree with the Courts of Appeals in Wilkerson and Battelstein that there is no substantive difference between a situation where a borrower satisfies a current interest obligation by simply assuming a greater debt to the same lender and one where the borrower and lender exchange checks pursuant to a plan whose net result is identical to that in the first situation.  In both situations, the borrower has simply increased his debt to the lender by the amount of interest.  The effect of this is to postpone, rather than pay, the interest.

In the instant case, it is clear that the purpose of the $1,587,310.46 advance on December 30, 1980, from John Hancock to White Tail was to provide White Tail with funds to satisfy its interest obligation to John Hancock.  White Tail's general partner had requested modification of the original 1980 credit arrangement so that the entire amount of interest could be

borrowed from John Hancock, in order to prevent a default on the interest obligation. In the Letter Agreement between White Tail and John Hancock, both borrower and lender agreed that the $1,587,310.46 advance would increase White Tail's loan and that it would be used to satisfy the current interest obligation. Checks were exchanged within a 2-day period to effect the transaction. The effect was to increase the amount of White Tail's principal loan obligation to John Hancock by the amount of interest due. The fact that the loan proceeds were run through White Tail's bank account does not affect the substance of the transaction. Wilkerson v. Commissioner, 655 F.2d at 983. It follows that White Tail, a cash basis partnership, is not entitled to a deduction for interest paid.

The other transaction in issue also involves a situation where an interest obligation was satisfied by borrowing funds from the original lender. On May 7, 1980, following the establishment of the 1980 credit arrangement, John Hancock advanced $19,645,000 to White Tail. Of this amount, John Hancock applied $227,647.22 to unpaid interest owed under the terms of a previous loan to White Tail. John Hancock did this by crediting White Tail's prior loan account to show that White Tail's interest obligation in the amount of $227,647.22 had been satisfied. John Hancock simultaneously increased the principal amount due from White Tail under the new 1980 credit arrangement.

As stated above, we hold that interest is not deductible under the cash method of accounting where the funds used to satisfy the interest obligation were borrowed for that purpose from the same lender to whom the interest obligation was owed. That is clearly what happened on May 7, 1980, when, pursuant to the terms of the 1980 credit arrangement, John Hancock credited White Tail's prior loan account for interest due and simultaneously increased the principal due on White Tail's new loan for the same amount.

Petitioners argue that the $227,647.22 should be considered as interest "paid", because the 1980 credit arrangement and the 1979 loan from John Hancock were "bona fide separate loans, with different interest rates and terms, and different security arrangements."  Under our holding, the fact that funds used to satisfy an interest obligation to a lender are borrowed from the same lender in a second loan is irrelevant.  Indeed, this Court has previously rejected the argument presented by petitioners. In Cleaver v. Commissioner, 6 T.C. at 454, we stated:

> where a taxpayer on the cash basis who is indebted on a
> note for past due interest borrows from his creditor an
> amount in excess of this past due interest on a second
> note, and the creditor gives to the taxpayer the
> principal amount of the second note less the amount of
> past due interest on the first note and marks this
> interest "paid," we have held that no cash payment has
> been made which would warrant a deduction.

See also <u>Nat Harrison Associates, Inc. v. Commissioner</u>, 42 T.C. at 624-625. Interest withheld by a lender from loan proceeds is nothing more than a promise to pay in the future and does not constitute a payment for purposes of section 163(a). <u>Menz v. Commissioner</u>, 80 T.C. at 1185-1186; <u>Rubnitz v. Commissioner</u>, 67 T.C. 621, 628 (1977); <u>Cleaver v. Commissioner</u>, <u>supra</u> at 454.

Based on the foregoing analysis, the interest deductions claimed by White Tail on its 1980 return in the amounts of $1,587,310.46 and $227,647.22 are not allowable, and we sustain respondent's disallowance of the corresponding deductions that petitioners claimed as their distributive share of partnership loss.

<u>Decision will be entered under Rule 155</u>.